ORIGINAL

Elliot A. Viches
1143 Stonylake Ct.
Sunnyvale, CA 94089
Telephone: (408) 745-0646
Fax: (408) 273-6595

Plaintiff in *Pro Se*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| In re<br><br>ELLIOT A. VICHES,<br><br>**Plaintiff.** | Chapter 13<br><br>Adversary Case No.<br>Related BK Case No. 05-59344 ASW<br><br>Judge: Hon. Arthur S. Weissbrodt<br>Place: U.S. Bankruptcy Court<br>280 South First Street<br>San Jose, CA 95113<br>Courtroom: 3020 |
| Elliot A Viches, Chapter 13 Plaintiff in *Pro Se*,<br><br>**Plaintiff,** vs.<br><br>BARCLAYS CAPITAL REAL ESTATE INC., dba HomEq Servicing, a Delaware corporation; Ocwen Loan Servicing, LLC, a Delaware Limited Liability Company; Mortgage Electronic Registration Systems, Inc. aka MERS, a Delaware corporation; WESTWOOD ASSOCIATES, a dissolved California corporation, WMC MORTGAGE CORP., a merged out California corporation; Wells Fargo Bank National Association- a California corporation; and Does 1-20<br><br>**Defendants.** | **COMPLAINT FOR FRAUD; INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS; BREACH OF CONTRACT; FOR VIOLATION OF STATUTORY DUTIES; DECLARATORY RELIEF; VIOLATTION OF THE FAIR CREDIT REPORTING ACT; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; UNLAWFUL BUSINESS PRACTICES; *AND* RESCISSION OF THE DOT AND NOTE** |

**VICHES V. HOMEQ ET AL. ADVERSARY COMPLAINT**  -Page 1 of 45-

Comes now Plaintiff Elliot A. Viches, Chapter 13 Plaintiff in *Pro Se* (hereafter "Plaintiff" or "Debtor") on behalf of himself and the Bankruptcy Estate of Plaintiff Elliott A. Viches ("Estate") and alleges as follows in support of this adversary complaint:

## JURISDICTION

This Court has jurisdiction over this proceeding pursuant to 20 U.S.C. §1334. Venue is proper before this Court pursuant to 28 U.S.C. § 1409 by virtue of the Chapter 13 case pending before the United States Bankruptcy Court for the Northern District of California (In re Elliot A. Viches, Bankruptcy Case Number 05-59344-ASW) (the "Bankruptcy Case").

This controversy is a "core proceeding" as that term is defined in 28 U.S.C. §157(b)(2)(A), (B), (C), (F), (K), and §157(b)(2)(O).

## PARTIES

1. Plaintiff is an individual resident in Sunnyvale, California and is the owner of real property and a residence constructed thereon located at 1143 Stonylake Court, Sunnyvale, California 94089 (the "Property").

2. Prior to May 22, 2005, Plaintiff purchased certain real property commonly known as Property.

3. On or about May 22, 2005, Plaintiff refinanced the loan (the "Loan") on the subject Property and executed a promissory note (the "Note"). The Note was secured by a deed of trust (the "DOT").

4. Plaintiff is informed and believes that Defendant BARCLAYS CAPITAL REAL ESTATE INC., dba HomEq Servicing, ("HomEq") is a Delaware corporation that was at all material times a servicer of the Loan till circa September 1, 2010.

5. Plaintiff is informed and believes that Defendant Ocwen Loan Servicing, LLC, ("Ocwen") is a Delaware Limited Liability Company that has acquired the mortgage servicing rights of HomEq and became a new servicer of the subject Loan commencing September 1, 2010.

6. Upon information and belief, Defendant Ocwen has become a successor-in-interest and assumed the liabilities of HomEq.

7. Plaintiff is informed and believes that Defendant Westwood Associates ("Westwood") is now a dissolved California corporation. Westwood is identified as the Trustee under that certain DOT related to the subject Loan.

8. Plaintiff is informed and believes that Defendant WMC Mortgage Corp., ("WMC") is now a merged out California Corporation, which was a wholesale originator of subprime residential mortgages owned by GE Money (formerly GE Consumer Finance). General Electric ("GE") bought WMC from Apollo Management in 2004. Upon information and belief, GE ceased WMC's operations in late 2007 due to the subprime market collapse pursuant to the Wikipedia information portal:

   http://en.wikipedia.org/wiki/WMC_Mortgage_Corporation

9. WMC is identified as the lender under that certain DOT related to the subject Loan.

10. Plaintiff is informed and believes that Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a Delaware corporation and a nominee of the subject Loan, which is also identified as a beneficiary under that certain DOT related to the subject Loan.

11. Plaintiff is informed and believes that Defendant Wells Fargo Bank National Association ("Wells Fargo") is a national banking association chartered in Sioux Falls, South Dakota with a principal place of business at 420 Montgomery Street, San Francisco, California 94104, the business entity registered as a corporation in California, and unilaterally claims to be

the Trustee of the subject Loan under Pooling and Servicing agreement dated as of September 1, 2005 ABFC Asset-Backed Certificates, Series 2005-WMC1.

12. Plaintiff is informed and believes that MCCARTHY HOLTHUS LLP ("McCarthy & Holthus") is a California Limited Liability Partnership[1], which at all material times has represented and/or now represents the Defendants HomEq, Wells Fargo and Ocwen as a legal counsel. McCarthy & Holthus is not named as a Defendant at this time.

13. "All Persons Unknown, Claiming Any Legal Or Equitable Right, Title, Estate, Lien, Or Interest In The Property Described In The Complaint Adverse To Plaintiff's Title, Or Any Cloud On Plaintiff's Title Thereto" are sued herein pursuant to California Code of Civil Procedure Section 762.020(a).

14. The true names and capacities, whether individual, corporate, associate, representative, or otherwise of the Defendants named in this Complaint as DOES 1 through 20, inclusive, are at the time unknown to plaintiff who therefore sues these defendants by their fictitious names. Plaintiff is informed and believes that said defendants, and each of them, are the agents, servants, and employees of each other and of the other defendants, and that said DOES in some way or in some manner share responsibility for the wrongs herein complained of. Plaintiff is further informed and believes and thereon alleges that at all times herein mentioned, and in doing the things herein complained of, each of said DOE defendants was acting within the scope, purpose, and authority of his or her said agency, service, and employment and for the benefit and with the consent and permission of the remaining defendants. Plaintiff is further informed and believes and thereon alleges that DOES 1 through 20 inclusive, participated in some way or manner in the wrongs complained of both as hereinafter alleged and/or in some manner not yet

---

[1] Plaintiff cannot confirm the registration of McCarty & Holthus LLP with the California Secretary of State through its website http://kepler.sos.ca.gov It only shows McCarty & Holthus LP, which is a separate entity.

ascertained, and plaintiff will seek leave of the Court to amend this Complaint to show the true names, capacities, and actions of said DOE defendants when ascertained.

## GENERAL ALLEGATIONS

15. The subject Loan is secured by the DOT dated May 19, 2005. The DOT was recorded with the Santa Clara County on May 27, 2005. (**Exhibit A** attached hereto). The Loan amount of $552,500 is based on adjustable every six (6) months mortgage rate after two-year fixed rate of 6.875% (Minimum Interest Rate Allowed Over Life of Loan) and it matures on June 1, 2035. Moreover, according to the terms of the Loan the interest rate used to calculate the new payment amount during each 6-month period is based upon the above Index plus a margin of 6.375% rounded off to the nearest 0.125%. The interest rate is capped and should be within the range from minimum of 6.875% to maximum of 13.375% with maximum increase/decrease per period 1% for the life of the Loan.

16. Beginning August 2005, the monthly payment due under the Note (**Exhibit B** hereto) was $3,386.36 fixed for a period of two years.

17. On October 16, 2005, the Plaintiff filed Chapter 13 bankruptcy under the old pre-BAPCPA rules.

18. As of the date of this Complaint, the Plaintiff has not yet confirmed a Chapter 13 Plan.

19. The first secured Loan was being held or serviced by HomEq with a current principle loan balance of approximately $551,397.47 (minus any interest paid to date) pursuant to the original secured claim No. 2 filed on November 10, 2005 with the Bankruptcy Court (the "Court") in the Bankruptcy Case.

20. Plaintiff was timely making his monthly payments to HomEq pursuant to the Note during the first two years and thereafter, except as specifically mentioned herein.

21. Despite receiving regular monthly payments, on May 2, 2007, HomEq filed a Motion Terminating the Automatic Stay of 11 U.S.C. § 362, seeking foreclosure under the DOT secured by the Plaintiff's Property. It is Plaintiff's position that the crux of that motion was a false allegation that 'the Plaintiff had failed to make three (3) post-petition payments (3/1/07 through 5/1/07) totaling $10,150.08 ($3,386.36x3), albeit Bankruptcy Fees & Costs and other legal expenses allegedly totaling $800 which HomEq now claims in addition to its Unpaid Principal Balance ("UPB"). HomEq had rejected two (2) consecutive electronic payments made by the Plaintiff through his bank in April and May of 2007, while unilaterally declaring him delinquent after intentionally losing a single payment in February 2006- the fact Plaintiff had found out only after HomEq filed its motion one an half year thereafter or after the single payment was lost. The said motion was consequently opposed by the Plaintiff at that time.

22. After receiving the aforementioned Motion, Plaintiff conducted his own investigation and found out that the allegations containing in the supporting under oath declarations of Minnesotan Attorney In Fact Mr. Walter, who was believed to be a representative of HomEq and counsel for HomEq Ms. Phillips, Esq. of McCarthy & Holthus were false. As such, only one lost in February 2006 payment of $3,383.36 was past due at the time of the said motion. Plaintiff timely made regular monthly payment on April 26, 2007 of $3,383.36 and the May 2007 payment was not due until the middle of the month. Plaintiff didn't have online excess to his account with HomEq at its website www.HomEq.com because it is only available to non-bankrupt customers. Therefore, Plaintiff believes that the aforementioned conduct by HomEq and its foreclosure mill law firm McCarthy & Holthus representing the Defendant was an oft-repeated pattern employed in other similar situations and based on this belief, the Plaintiff alleges that HomEq purposefully lost one single payment in 2006 in order to wrongly initiate a foreclosure on the subject Property without any legitimate cause or first trying to mitigate the alleged damages.

23. On May 7, 2007, HomEq sent Plaintiff Interest Rate Change Notification, wherein the Interest Rate was changed from 6.87% to 9.87% (by 3%) or from $3.383.36 to $4,610.43 effective June 1, 2007. This was a maximum single increase for the life of the Loan.

24. Most of the payments made to HomEq by Plaintiff during all the material times were sent through Washington Mutual Bank (now Chase) either electronically or by personal check. However, HomEq reported at least one lost by it payment in February 2006 to major Credit Bureaus. The fact of one missing payment HomEq decided not to notify the Plaintiff about until it filed the motion for relief from the stay in May 2007, over one year and three months after the payment was lost, conveniently coincided with the significant increase in the interest rate of the Loan by 3%.

25. The Court denied HomEq's Motion in part regarding relief from automatic stay and on July 12, 2007, issued Adequate Protection Order ("Protection Order"). Plaintiff was trying to mitigate the alleged damages after learning of one lost in 2006 payment. All Plaintiff's mitigation efforts and request to repair his credit based on a single lost in February 2006 payment were rejected by HomEq.

26. As a result of HomEq's actions, Plaintiff was subjected to undue financial hardship by repaying total of $10,150.08 (~$845.84 per month), which is equivalent of three regular monthly mortgage payments (one lost + 2 rejected) payable over twelve (12) months beginning July 1, 2007, while the interest rate and the monthly payments were the highest thus far. Consequently, the Plaintiff, who is self-employed had to undertake twice as much work to keep up with the high mortgage payments with additional monthly payments, which were lost in 2006 and rejected by HomEq in 2007.

27. On July 11, 2007, HomEq consequently filed its amended proof of claim No. 11 in the amount of $552,197.47, which includes $800 in post-petition attorney's fees.

28. On November 7, 2007, HomEq sent Plaintiff second Interest Rate Change Notification, wherein the Interest Rate was changed from 9.87% to 10.87% or from $4,610.43 to $5,037.17, effective January 1, 2008. Plaintiff paid $845.84 per month on top of $647 per month trustee fee and other living and business expenses.

29. The estimated Market Value of the Property based on appraisal done prior to filing of the Chapter 13 petition in October of 2005 was $650,000 or $98,602.53 over the Loan amount on the HomEq's Proof of Claim. Pursuant to www.zillow.com the estimated market value of the Property as of August 1, 2007 (around the time the Protection Order was issued) was $697,975 or $146,577.53 over the Loan amount. Current (as of 10/29/10) estimated market value of the subject Property is $421,000 or ($130,397.47) "underwater" below the Loan amount.

30. On May 14 and May 15, 2008, Plaintiff sent his first request for Loan modification to HomEq, which was faxed at 916-339-6948 to Consumer Relations Department of HomEq (as per Jennifer's HomEq's Employee Code VIJS0 advice). Plaintiff believed that he was entitled to the "U.S. Treasury "Fast Track" Program" and could have qualified for the 5-year fixed initial rate program available at that time on HomEq's website www.HomEq.com. No response to the Plaintiff's first modification request was received from HomEq whatsoever.

31. Plaintiff has made monthly mortgage payments as follows: $3,386.36 per month from circa August of 2005 till July 1, 2007 or based on fixed introductory rate of 6.875% for two (2) years; $4,610.43 per month from July 1, 2007 till January 1, 2008; $5,037.17 per month from January 1, 2008 till July 1, 2008; $4,611.89 per month from July 1, 2008 till January 1, 2009; $4,455.16 per month from January 1, 2009 till July 1, 2009; 4,045.78 per month from July 1, 2009 till January 1, 2010; 3,650.09 per month from January 1, 2010 till July 1, 2010; $3,411.20 [current rate] per month from July 1, 2010 till January 1, 2011 [unless modified]. Plaintiff paid over $200,000 to the servicer of the Loan thus far, plus Loan origination and other fees.

32. Plaintiff has also fully repaid total of $10,150.08 (or ~ $845.44 per month) in post-petition arrears pursuant to the Protection Order during the twelve (12) months in 2007 and 2008 on top of $4,610.43 and $5,037.17 mortgage monthly payments during the pick of the Loan performance thus far.

33. On March 12, 2010, the Court approved compromise of controversy re: settlement in the related to this case adversary proceeding, Case No. 07-05165, entitled <u>Derham-Burk v. HSBC Mortgage Services, Inc. et al</u> This settlement resolves by cramming down the second HSBC line of credit ($97,000) secured by the Property.

34. On April 5, 2010, Plaintiff sent second request for Loan modification to HomEq requesting modification under Home Affordable Modification Program ("HAMP") http://makinghomeaffordable.gov and other available on HomEq's website http://www.HomEq.com/challenges/repayment.jsp loan modification options. Plaintiff faxed his second request to Consumer Relations Department at (916) 339-6948. Plaintiff also faxed at (619) 685-4810 and emailed (jhester@mccarthyholthus.com) it to Mr. Hester, Esq. of McCarthy & Holthus, LLP- counsel for HomEq requesting a response by the end of April. Plaintiff was current on his mortgage payments at the time the second modification request was made. Moreover, Plaintiff couldn't login on the HomEq's website to request loan modification online, because this option somehow is not available to its customers in bankruptcy.

35. On April 26, 2010, Plaintiff contacted Mr. Hester by phone requesting the status of his second modification request. Surprisingly, Mr. Hester said that he didn't get it on April 5, 2010. Plaintiff resend the April 5, 2010 request again, including the fax confirmation indicating that the 4-page fax went through on April 5. Plaintiff requested a prompt response with regards to the same. No response to the Plaintiff's April 5 and April 26, 2010 correspondence related to his request to expedite the modification was received from Mr. Hester.

36. On April 9, 2010, the HomEq Consumer Relations Department responded by acknowledging the receipt of the April 5, 2010 second request for Loan Modification.

37. On June 6, 2010, HomEq sent a letter requesting to cure default under the terms of the Protection Order. The default amount was calculated as follows: $3,650.09x2=$7,300.18 plus late charge of $182.50 or total of $7,480.68. The letter requested to cure the default by 6/14/10 or within ten (10) days. The letter states in pertinent part that if default is not cured, HomEq will have no other alternative, but obtain possession of the Property (foreclose).

38. On June 8, 2010, Plaintiff contacted Mr. Standard, Esq. who was signatory to the June 6, 2010 default letter. Plaintiff, among other things, informed Mr. Standard of his pending request for loan modification under HAMP. Mr. Standard suggested to the Plaintiff to also contact Mr. Krešimir Grgurević of McCarthy & Holthus, LLP to expedite the modification request. The Plaintiff contacted Mr. Grgurević the same day by email and phone.

39. On June 10, 2010 or two (2) months and five days (5) after Plaintiff sent his second request for modification, HomEq finally sent HAMP Loan Modification package. The HomEq representative Krešimir Grgurević of McCarthy & Holthus informed Plaintiff that if the default is not cured, HomEq will be obtaining relief from stay in order to file a notice of default on the Property.

40. On June 14, 2010, Plaintiff sent an email to Mr. Grgurević and Mr. Standard of McCarthy and Holthus explaining his position regarding the Loan modification. Particularly, Plaintiff explained that he was waiting for over two months to receive the HAMP Modification Package despite his efforts to expedite the request. [Note that HomEq doesn't allow for online modification requests to clients in bankruptcy.] Moreover, Plaintiff requested other available on HomEq's website loan modification options. Finally, Plaintiff tendered to cure any arrears under the new modified rate, if the Loan is modified. Plaintiff also proposed a 60-day moratorium period

in lieu of the Court's intervention or until his application for the modification under one of the available options will have been considered, whichever is sooner.

41. On June 15, 2010, Mr. Grgurević acknowledged the receipt of the June 14, 2010 letter and informed Plaintiff that he is awaiting a response from HomEq and will forward it when received. No further response from HomEq on other modification options has been received.

42. On July 20, 2010, HomEq filed and served the Proposed Order pursuant to the Protection Order requesting relief from automatic stay to record a Notice of Default (the "NOD") against the Property. Interestingly, for the first time in this case, it was revealed in the declaration of Vice President of HomEq, Tracey O'Brien-Moore in support of the Proposed Order that HomEq is a servicing agent for Wells Fargo, as Trustee under Pooling and Servicing agreement dated as of September 1, 2005 ABFC Asset-Backed Certificates, Series 2005-WMC1, it assignees and/or successors.

43. On July 21, 2010, Plaintiff protested the Proposed Order to HomEq, which he believes does violate the new foreclosure laws. Plaintiff also proposed to rescind the Protection Order, which he believes was procured by fraud.

44. On July 21, 2010, Mr. Matthew Learned, Esq of McCarthy & Holthus responded by defending the pending NOD request should the HAMP evaluation be unsuccessful. Mr. Learned also refused to rescind the Protection Order.

45. On July 21, 2010, Plaintiff responded to Mr. Learned by asking as to why can't HomEq wait for 30-45 days or until the decision on the pending HAMP loan modification request will be known? Mr. Learned responded by saying: "The Notice of Default has not been recorded and cannot be recorded until our client has satisfied the requirements under the current legislation. Our order filed with the court this week simply allows our client to proceed with the Notice of

Default without further bankruptcy court approval, subject to fulfillment of the statutory guidelines."

46. Plaintiff believes that he is eligible for HAMP modification, because he meets all of the program's eligibility requirements. First, the mortgage Loan relates to his primary residence and it is far less than $729,750. Second, the mortgage Loan was originated prior to January 1, 2009. Third, he is delinquent and approximately four monthly payments are past due and such delinquency is one of the necessary qualification requirements of the HAMP Program. Finally, the monthly payments for the mortgage loan are more than 31% of his current gross monthly income and Plaintiff calculated as of August 26, 2010, following the NPV formulas under HAMP Base Net Present Value (NPV) Model v3.0 Model Documentation dated December 9, 2009 that it would be beneficial to modify the subject Loan with as opposed to foreclose on the Property with up to circa $53,738.32 in benefit to the investors, whoever they are.

47. Around the week of August 16, 2010, Plaintiff received a letter from HomEq notifying of the loan servicer change to Ocwen effective September 1, 2010. The same letter informed of the HAMP modification request transfer to Ocwen, which is still pending as of the time of filing of this Complaint.

48. On August 24, 2010, Plaintiff sent a qualified written request to HomEq pursuant to 12 U.S.C. §2605(e) requesting among other things documents related to the chain of assignment of the Plaintiff's loan. Similar request was sent to Ocwen. In response, the former and current servicers of the Loan produced, among other things, a certified copy of the original Note, a true and correct copy of which is attached hereto as **Exhibit B**. Many Plaintiff's requests were not responded to by the servicers of the Loan and will be subject to further discovery requests.

49. On September 15, 2010, the Court held a preliminary hearing on the request to record the NOD and requested Wells Fargo to provide further proof of standing by producing the

original Note and declaration clarifying standing issues by October 6, 2010. The evidence before the Court thus far is the under oath declaration of Tracey O'Brien-Moore- the alleged Vice President of the former servicer HomEq dated July 20, 2010, which reads in pertinent parts as following[Docket #382]:

> "5.Secured Creditor is the holder of a Promissory Note dated 5/19/2005, in the principal amount of $552,500.00, which is secured by the Deed of Trust of the same date, and recorded in the Official Records of Santa Clara County, on 5/27/2005"

However, the actual Note produced pursuant to the QWR of the Plaintiff shows that no assignment was of the Note was made thus far, whatsoever, as discussed hereunder in more details.

50. On October 20, 2010, the Court had a second hearing and granted the Wells Fargo's and Ocwen's further request for a continuance till December 8, 2010 to produce evidence of standing.

51. Meanwhile, on October 27, 2010, Wells Fargo and Ocwen had objected to the Plaintiff's 5th Amended Pot Plan filed by the Debtor on October 20, 2010, prior to producing evidence of standing in the Bankruptcy Case. The current confirmation hearing is scheduled for November 2, 2010.

## GENERAL FACTS RELATED TO LOAN MODIFICATION LEGISLATURE

Discussed herein are various new foreclosure laws, e.g. controlling case authorities, government programs, acts, directives, Senate Bills, related State and Federal statutes applicable in this case, which are collectively referred to herein as the "Foreclosure Laws".

52. In 2008, Governor Arnold Schwarzenegger signed California Senate Bill 1137 ("SB 1137) (a.k.a. the Perata Mortgage Relief Bill) into law. Section 10(b) of SB 1137 provides that the provisions of sections 2 and 4 of the Act (i.e., Civil Code §§ 2923.5 and 2924.8) shall become operative "60 days after the "effective date" of SB 1137. The "effective date" was July 8,

2008 and 60 days thereafter should be Saturday, September 6, 2008

53. Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 et. seq. (2009).

54. The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership." 12 U.S.C.A. §5201.

55. The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions.

56. Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

57. In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

58. The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures." 12 U.S.C.A. §5219.

59. The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

60. The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

61. On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

62. The Making Home Affordable program consists of two subprograms. The first subprogram relates to the creation of refinancing products for individuals with minimal or negative

equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

63. The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

64. HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money. Both the enabling legislation and the federal government's own implementing guidelines make it clear that eligible and qualified homeowners "shall" receive a loan modification, thus creating legal entitlements for thousands of California homeowners facing foreclosure.

65. Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable. Servicers receive $1000.00 for each HAMP modification.

66. The industry entities that perform the actual interface with borrowers -- including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure -- are known as "servicers." Servicers typically act as the agents of the entities that hold mortgage loans. HomEq is a servicer operated by Wells Fargo Bank, N.A. and its actions described herein were made as agents for the entities that hold mortgage loans.

67. HomEq's servicing obligations are set forth in various contracts commonly known as Pooling and Servicing Agreements ("PSA") between HomEq and true owners of the underlying notes, typically a trust or pool containing thousands of securitized mortgage loans. One of such PSA with Wells Fargo Bank NA, which contains, among many others, the subject Loan, is disclosed in the Ms. O'Brien-Moore declaration in support of the Proposed Order.

68. Should a servicer elect to participate in HAMP, they execute a Servicer Participation Agreement ("SPA") with the federal government.

69. On April 13, 2009, Michael J. Heid of Wells Fargo executed an SPA, thereby making Wells Fargo a participating servicer in HAMP. A copy of this SPA is attached hereto as