**Exhibit C.** Virtually identical SPA agreements were executed by HomEq and Ocwen respectively.

70. The SPA executed by Mr. Heid of Wells Fargo incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, frequently asked questions, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation"

71. The Program Documentation requires Participating Servicers **to evaluate all loans, which are 60 or more days delinquent for HAMP modifications.** (SD 09-01 p. 4.) Debtor's delinquent Loan falls into this category. In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

72. A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP"). The TPP consists of a three-month period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided. The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in SD 09-01. Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

73. HomEq offers TPPs to eligible homeowners by way of a TPP Agreement, which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

74. If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all three TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

75. HomEq has routinely failed to live up to its end of the TPP Agreement and offer permanent modifications to homeowners. As such, in November 2009, the U.S. Treasury reported

that HomEq had 40,969 HAMP-eligible loans in its portfolio. Of these loans, **NONE** resulted in permanent modifications (approximately 2% including Active Trials)

| Servicer | Participation Date | Estimated Eligible 60+ Day Delinquency | Trial Plan Offers Extended | All HAMP Trials Started | Active Trial Modifications | Perm. Modifications | Active Trials + Permanents as Share of Eligible 60+ Day Delinquencies |
|---|---|---|---|---|---|---|---|
| HomEq | 8/5/09 | 40,969 | 1,987 | 657 | 657 | 0 | 2% |

http://makinghomeaffordable.gov/docs/MHA%20Public%20111009%20FINAL.PDF

76. In May 2010, the U.S. Treasury reported that HomEq had 16,233 HAMP-eligible loans in its portfolio. Of these loans, just 3,054 resulted in permanent modifications (approximately 18.8%), which is by 3.2% less than State of CA average. Ocwen has better HAMP statistics.

| Servicer | Participation Date | Estimated Eligible 60+ Day Delinquency | Trial Plan Offers Extended | All HAMP Trials Started | Active Trial Modifications | Permanent Modifications | Permanents as Share of Eligible 60+ Day Delinquencies |
|---|---|---|---|---|---|---|---|
| HomEq | 8/5/09 | 16,233 | 6,107 | 4,365 | 1,111 | 3,054 | 18.8% |

http://www.financialstability.gov/docs/May%20MHA%20Public%20062110.pdf

77. Under Supplemental Directive ("SD") 10-02 of HAMP Program dated March 24, 2010, which became effective on June 1, 2010, extended HAMP benefits to borrowers, like the Debtor, who has filed for bankruptcy court protection.

78. Incomplete Information Notices ("IIN") of either 30-day (the first notice) or 15-day (the second notice) are required. [SD 10-01, p. 3, l. 16-29] [SD 10-02, p. 3, l. 29-31]. Since Plaintiff sent his HAMP modification request on July 9, 2010, he received IN request from Ocwen, which is currently due on or before November 5, 2010 and constitutes new requests that are different from the original requirements. Plaintiff is planning on timely complying with the first request.

79. If the servicer denies the HAMP request, the servicer must provide a written Non-Approval Notice ("NAN") [SD 09-08, p. 1, l. 29-32, p. 2, l. 22-26, 30-39]

80. On December 16, 2009, Attorney General ("AG") of the State of Ohio filed a complaint against HomEq for alleged violations of Ohio's consumer protection and other laws. http://www.ohioattorneygeneral.gov/HomEqComplaint

81. The foreclosure process generally begins when a person misses a couple of payments on a mortgage loan. There are three (3) important steps in the foreclosure process: (a) Notice of Default relevant here: When a property owner falls behind on his or her mortgage payments, the Lender must make contact with the property owner in an attempt to avoid foreclosure. A notice of default is a notification given to a borrower stating that he or she has not made the payments by the predetermined deadline. It dictates that if the money owed (plus an additional legal fee) is not paid in a given time, the Lender may choose to foreclose the borrower's property; (b) Notice of Sale (auction announcement): Three months after the Notice of Default, the Lender schedules an auction of the property by filing a Notice of Sale. Auctions can be postponed by agreement between the property owner and the Lender if the property owner takes action to remedy the default and avoid foreclosure; (c) Auction Sale: The property is auctioned off at the time and place listed on the Notice of Sale. It is either sold to a third person or, if there are no bids made on the property at auction, the Lender takes ownership.

82. Under SD 10-02 of HAMP Program the following significant requirements were introduced and became effective on June 1, 2010: [Emphasis added]

- Clarification of the requirement to solicit proactively all borrowers whose first mortgage loans are potentially eligible for HAMP and who have two or more payments due and unpaid. Reasonable solicitation efforts are defined.
- **Prohibition against referral to foreclosure until either: (i) a borrower has been evaluated and determined to be ineligible for HAMP; or (ii) reasonable solicitation efforts have failed.**
- **A requirement that a servicer, in certain specific circumstances, allow a 30-day borrower response period following issuance of a Non-Approval Notice before a foreclosure sale may be conducted.**
- A requirement that a servicer provide a written certification to the foreclosure attorney or trustee stating that a borrower is not HAMP-eligible before a foreclosure sale may be conducted.
- A requirement that servicers must consider borrowers in active bankruptcy for HAMP if a request is received from the borrower, borrower's counsel or bankruptcy trustee.
- Clarification of the requirement that servicers use reasonable efforts to obtain approval from investors to participate in HAMP.
- **When a borrower in an active Chapter 13 bankruptcy is in a trial period plan and the borrower has made post-petition payments on the first lien mortgage in the amount required by the trial period plan, a servicer must not object to confirmation of a borrower's Chapter 13 plan, move for relief from the automatic bankruptcy stay, or move for dismissal of the Chapter 13 case on the basis that**

the borrower paid only the amounts due under the trial period plan, as opposed to the non-modified mortgage payments.

83. In July 2008 or a year ago, the California State Legislature enacted SB 1137 as an urgency measure designed to address the adverse effects of the State's high foreclosure rate.

84. Moreover, the extensive citation to the Legislature's reasoning in Senate Bill 1137 signed into law in is instructive:

SECTION 1. The legislature finds and declares all of the following:

(a) California is facing an unprecedented threat to its state economy and local economies because of skyrocketing residential property foreclosure rates in California. . ..
(b) High foreclosure rates have adversely affected property values in California, and will have even greater adverse consequences as foreclosure rates continue to rise. . ..
. . .
(d) It is essential to the economic health of California for the state to ameliorate the deleterious effects on the state economy and local economies and the California housing market that will result from the continued foreclosures of residential properties in unprecedented numbers by modifying the foreclosure process to require mortgagees, beneficiaries, or authorized agents to contact borrowers and explore options that could avoid foreclosure. These changes in accessing the state's foreclosure process are essential to ensure that the process does not exacerbate the current crisis by adding more foreclosures to the glut of foreclosed properties already on the market when a foreclosure could have been avoided. Those additional foreclosures will further destabilize the housing market with significant, corresponding deleterious effects on the local and state economy.

California Civil Code section provides in pertinent part 2923.5(a)
**(1): A mortgagee, trustee, beneficiary, or authorized agent may not file a notice of default pursuant to Section 2924 until 30 days after initial contact is made as required by paragraph (2)or 30 days after satisfying the due diligence requirements as described in subdivision (g).
(2) A mortgagee, beneficiary, or authorized agent shall contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. During the initial contact, the mortgagee, beneficiary, or authorized agent shall advise the borrower that he or**

she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days. The assessment of the borrower's financial situation and discussion of options may occur during the first contact, or at the subsequent meeting scheduled for that purpose. In either case, the borrower shall be provided the toll-free telephone number made available by the United States Department of Housing and Urban Development (HUD) to find a HUD-certified housing counseling agency. Any meeting may occur telephonically. [Emphasis added].

85. Section 2 of SB 1137 prevents a lender from filing a notice of default ("NOD") pursuant to Section 2923.5(a) of the California Civil Code ("Section 2923.5") until 30 days after the lender has made contact with the borrower in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. (This recorded notice of default is the first step in the non-judicial foreclosure process for real property in California.) During the initial contact, the lender must advise the borrower of the borrower's right to request a subsequent meeting to occur within 14 days. In either the initial or subsequent meeting, the lender must also provide the borrower with the toll-free telephone number made available by the U.S. Department of Housing and Urban Development ("HUD") to find a HUD-certified housing counseling agency. That toll-free telephone number is currently 1-800-569-4287.

86. Both HomEq and its successor Ocwen did not comply with the contact requirements of section 2923.5. Moreover, both HomeEq and Ocwen didn't comply with SD 10-02 of HAMP program by initiating the foreclosure process or by applying to the Court to record NOD while the HAMP request is pending. The same applies to Wells Fargo.

87. Besides fraudulently obtaining the existing Protection Order after unsuccessful first attempt to foreclose on the Property has failed in 2007, during the period when there was over $146K surplus in equity (before the so called Global Mortgage Crisis has been officially realized), and consequently after ruining the Debtor's credit history by recording the lost in 2006 single payment with the major Credit Bureaus, servicer HomEq has completely ignored the first May 2008 Debtor's request for Loan modification and significantly delayed for over two (2) months

providing the HAMP package and didn't approve the Plaintiff's HAMP request for almost four (4) months for which Plaintiff is clearly qualified.

88. HomEq, Wells Fargo and its successor Ocwen also are trying to initiate the second in this case foreclosure action, while the loan modification application is pending and loss mitigation negotiations are underway in clear violation of the new foreclosure laws.

89. A lender's obligation to explore options to prevent foreclosure can be enforced by private right of action and the statute requiring lender to explore options to prevent foreclosure is not preempted by federal law. A private right of action may inhere within a statute, otherwise silent on the point, when such a private right of action is necessary to achieve the statute's policy objectives.

90. On July 8, 2008, Governor Schwarzenegger signed into law SB 1137. This Act, also known as the Perata Mortgage Relief Bill, was subsequently codified as Civil Code sections 2923.5 and 2923.6. It governs any residential mortgage executed between January 1, 2003 and December 31, 2007, thus, making the subject Property eligible.

91. Among the protections which the statute contains for borrowers in foreclosure is a mandatory notification, meeting, and consultation process that must be made available to the borrower by the foreclosing lender, mortgagee, trustee, beneficiary, or authorized agent, prior to filing a notice of default under Civil Code section 2924. The statute states that it is "modifying the foreclosure process to require mortgagees, beneficiaries, or authorized agents to contact borrowers and explore options that could avoid foreclosure."

92. Civil Code section 2923.5 also contains additional requirements, lenders, mortgagees, trustees, beneficiaries, or authorized agents must comply with prior to filing a Notice of Default pursuant to California Civil Code Section 2924. The section requires the Lender to contact the borrower in person or by telephone in order to assess the borrower's financial situation and explore options for the borrower to avoid foreclosure. During the initial contact, the Lender shall advise the borrower that he or she has the right to request a subsequent meeting and, if requested, the mortgagee, beneficiary, or authorized agent shall schedule the meeting to occur within 14 days. The assessment of the borrower's financial situation and discussion of options may

occur during the first contact, or at the subsequent meeting scheduled for that purpose. In either case, the borrower shall be provided the toll-free telephone number made available by the United States Department of Housing and Urban Development (RUD) to find a HUD-certified housing counseling agency. Any meeting may occur telephonically. Civil Code Section 2923.5 further requires that the Lender may not file a Notice of Default until 30 days after this contact and good faith discussion takes place. None of the foregoing requirements were met by HomEq, Wells Fargo and/or Ocwen.

93. HomEq, Ocwen and Wells Fargo should be required to fully comply with SD 10-02 of federal HAMP Program and not initiate any foreclosure process before Plaintiff has been evaluated and determined to be ineligible for HAMP, including meeting other requirements cited hereinabove, including an opportunity to object within 30 days after a Non-Approval Notice will have been received, if Plaintiff is rejected.

94. Most importantly, if Plaintiff is going to be approved for HAMP and makes post-petition payments on the first lien mortgage in the amount required by the trial period plan, Ocwen and Wells Fargo must not object to confirmation of the Debtor's Chapter 13 plan, move for relief from the automatic bankruptcy stay, or move for dismissal of the Chapter 13 case on the basis that the borrower paid only the amounts due under the trial period plan, as opposed to the non-modified mortgage payments. Ocwen and Wells Fargo just did that by filing on October 27, 2010 the objections to the Debtor's 5th Amended Chapter 13 Pot Plan in the Bankruptcy Case.

95. Plaintiff requested that HomEq pay the property taxes and home insurance for the Property in a timely manner, such payment to be added to the escrow account to be paid by Plaintiff A copy of Plaintiff's faxed letter to HomEq is attached hereto as **Exhibit D**.

96. Under HAMP guidance (see http://makinghomeaffordable.gov/borrower-faqs.html#28 ):

> "All loans modified under HAMP must include an escrow account for payment of future property taxes and hazard insurance, unless prohibited by state law. If your existing loan does not include an escrow account, one will be established. A new escrow account may require collection of a sufficient reserve to pay the taxes and insurance on or before they are next due. The reserve amount cannot be added to the modified loan amount. The servicer may give you the option of paying the reserve amount at the time the loan is modified or the option of spreading the amount over a

period of 60 months and including it in the monthly escrow payment."

97. HomEq agreed to timely set up the escrow account for Plaintiff's property taxes and home insurance, and then failed to do so. As a result of reliance on such escrow account, Plaintiff incurred some penalties.

98. Plaintiff, who is self-employed for over twelve (12) years and who represents himself in *Pro Se* without formal training in law, had to spend over three and a half months since July 20, 2010 and counting, defending illegal and frivolous actions by HomEq, Ocwen and Wells Fargo described herein, which prevented him from making a meaningful living to pay for the mortgage and to timely meet other financial obligations. Plaintiff spent countless hours studying the intricate foreclosure laws, related federal and California statutes and cases, as well as pleading writing techniques. Debtor was subjected to heavy motion practice in the Bankruptcy Case during the past three and a half months, as well as in May 2007 through July 2007, defending many frivolous actions brought by the aforementioned Defendants.

## MERS' AUTHORITY TO OPERATE IN CALIFORNIA

99. The California Corporations Code requires entities that "transact[] intrastate business" in California to acquire a "certificate of qualification" from the California Secretary of State. Cal. Corp. Code § 2105 (a) . MERS' activities don't fall within exceptions to the statutory definition of transacting intrastate business, such that these requirements do apply. See Cal. Corp. Code § 191. Cal. Corp. Code § 191(d) (3). Cal. Corp. Code § 191(d) enumerates various actions that do not trigger the registration requirement when performed by "any foreign lending institution." MERS is not such an institution, thus, MERS cannot protect itself under this exemption.

100. The statute defines "foreign lending institution" as "including, but not limited to: [i] any foreign banking corporation, [ii] any foreign corporation all of the capital stock of which is owned by one or more foreign banking corporations, [iii] any foreign savings and loan

association, [iv] any foreign insurance company or [v] any foreign corporation or association authorized by its charter to invest in loans secured by real and personal property[.]" Cal. Corp. Code § 191(d). Neither any published California decision nor any federal decision has interpreted these terms much. [Mostly federal cases support this position]. MERS does not itself invest in loans or lend money, it appears that [i], [iii], and [v] do not apply. MERS does not claim to be an insurance company under [ii] . Finally, it is certainly plausible that not all of MERS's owners are foreign corporations. MERS does not fall within any of the five enumerated examples of "foreign lending institutions"

101. Nor MERS can rely on California Corporations Code § 191(c)(7) which states that a foreign corporation shall not be considered as doing business in this state based on "creating evidences of debt or mortgages, liens or security interests on real or personal property." Whatever "creating evidences" means, it is something other than the assignment of loans. The plain meaning of the term is to create evidence of a transaction, such as an assignment, not to engage in the transaction itself.

102. MERS has acted in violation of its own "terms and conditions." (**Exhibit E** hereto) These "terms" provide in pertinent parts as follows:

> "2. The Member [EV: in this case Wells Fargo], at its own expense, shall promptly, or as soon as practicable, cause MERS to appear in the appropriate public records as the mortgagee of record with respect to each mortgage loan that the Member registers on the MERS® System. MERS shall serve as mortgagee of record with respect to all such mortgage loans solely as a nominee, in an administrative capacity, for the beneficial owner or owners thereof from time to time. MERS shall have no rights whatsoever to any payments made on account of such mortgage loans, to any servicing rights related to such mortgage loans, or to any mortgaged properties securing such mortgage loans. MERS agrees not to assert any rights (other than rights specified in the Governing Documents) with respect to such mortgage loans or mortgaged properties. References herein to "mortgage(s)" and "mortgagee of record" shall include deed(s) of trust and beneficiary under a deed of trust and any other form of security instrument under applicable state law."
> ............................

6. MERS and the Member agree that: (i) the MERS® System is not a vehicle for creating or transferring beneficial interests in mortgage loans….."

Thus, MERS' corporate charter is implying that an action in violation thereof would be *ultra vires* or a violation of its own terms, because neither the Note nor DOT has been assigned to Wells Fargo.

103. At all relevant times herein till July 20, 2010, MERS was not registered in California and could not prepare or execute the Assignment of DOT or substitution of Trustee. MERS had no legal authority to take any of such actions. Deeds of Trusts are contractual in nature. Any such assignments are therefore void as a matter of law.

## REAL ESTATE MORTGAGE INVESTMENT CONDUIT (REMIC)

104. Although the Defendants attempting to foreclosure on the Property refer to themselves as "Trustees" of a "Trust," the entity like Wells Fargo is not "Trustee" nor "Trust" as defined by California law.

105. The "Trusts" coming to Court are actually Mortgage Backed Securities ("MBS"). The Servicers, like HomEq or Ocwen, are merely administrative entities which collect the mortgage payments and escrow funds. The MBS have signed themselves up under oath with the Securities and Exchange Commission ("SEC,") and the Internal Revenue Service ("IRS,") as mortgage asset "pass through" entities wherein they can never own the mortgage loan assets in the MBS. This allows them to qualify as a Real Estate Mortgage Investment Conduit ("REMIC") rather than an ordinary Real Estate Investment Trust ("REIT"). As long as the MBS is a qualified REMIC, no income tax will be charged to the MBS. For purposes of this action, "Trust" and MBS are interchangeable. There is no "Trust Agreement" in existence. The entity filing has utilized a California legal term it has no right to use for the sole purpose of misleading the Court.

106. Although the "Trust" listed may be registered with the SEC and the Internal Revenue Service ("IRS") as a REMIC, more often than it is not properly registered in any state of the union as a Corporation, Business Trust, or any other type of corporate entity. Therefore, the REMIC does not legally exist for purposes of capacity for filing a law suit in California. Such foreclosing entity lacks capacity to sue.

107. Additionally, and important to the issues presented with this particular action, is the fact that in order to keep its tax status and to fund the "Trust" and legally collect money from investors, who bought into the REMIC, the "Trustee" or the more properly named, Custodian of the REMIC, had to have possession of ALL the original blue ink Promissory Notes and original allonges and assignments of the Notes, showing a complete paper chain of title.

108. Most importantly for this action, the "Trustee"/Custodian MUST have the mortgages recorded in the investors name as the beneficiaries of a MBS in the year the MBS "closed." Every mortgage in the MBS should have been publicly recorded in the California County where the property was located with a mortgage in the name similar to "Trustee under Pooling and Servicing agreement dated as of September 1, 2005 ABFC Asset-Backed Certificates, Series 2005-WMC1." The mortgages in the referenced example would all have had to been publicly recorded in the year 2005.

109. As explained hereinabove, the "Trusts" were never set up or registered as Trusts. The Promissory Note was never transferred and the DOT never recorded, except for once originally, when the Loan was originated.

110. In the above scenario, even if the attorney for the servicer (from McCarthy & Holthus) who is foreclosing on behalf of the Trustee (Wells Fargo), which is in turn acting for the securitized Trust) produces a copy of a note, or even an alleged original, the mortgage Loan

was not timely conveyed into the Trust under the requirements of the prospectus for the Trust or the REMIC requirements of the IRS.

111. As applied to the Loan in this action, the end result would be that the required MBS asset, or any part thereof (mortgage Note or security interest), wasn't legally transferred to the Trust to allow the Trust to ever even be considered a "holder" of a mortgage loan. Neither the "Trust" or the Servicer would ever be entitled to bring a foreclosure or declaratory action in this case. The Trust will never have standing or be a real party in interest. It will never be the proper party to appear before the Court.

112. Besides the fact that any transfer of a mortgage loan into the Trust after the "cutoff date" (in this example after 2005), destroys the trust's REMIC tax exempt status, and this "Trust" (and potentially the financial entities who created them) would owe millions of dollars to the IRS, as the income would be taxed at of one hundred percent (100%), which is their problem, subsequent to the "cutoff date" in the end of 2005 listed in the prospectus, whereby the mortgage Note and security for these notes had to be identified, and Note and Mortgages transferred, and thereafter, the pool is permanently closed to future transfers of mortgage assets. Any late properly reordered transfer to the Trust would be of no effect and void. In this case after 2005. No wonder as to why HomEq and Ocwen failed to produce any requested by the Plaintiff documents relevant to this type of activities.

113. At the time the Plaintiff signed the Promissory Note and DOT in 2005, he was unknowingly converting the Property into an asset of a MBS. The Plaintiff was never informed of the nature of this tax avoidance scheme by the Defendants. He was deliberately induced into signing a Negotiable Instrument which was never intended as such, but was intended as collateral for a MBS.

114. The fact that the loan was meant to fund a MBS was a "material disclosure" which was deliberately and intentionally undisclosed. The failure to disclose the identity of the true lender at closing was also a "material disclosure;" the nature of which would make the contract voidable under California contract law.

115. While attempting to circumvent California recording Statutes, the MBS Trust here created for itself a situation wherein it had no legally recognizable interest in the loans for the benefit of the investors. The investors were invested in nothing. The MBS possessed nothing on the date the REMIC closed and perpetrated a fraud on the investors and the American taxpayer through its fraudulent qualification as a REMIC with the SEC. Like the Cutoff Date, each MBS/Trust had a Closing Date in this case in 2005. The Closing Date is the date that the individual identified mortgages were to be transferred through the Custodian for the benefit of the investors.

116. The Trust Custodian must certify that for each mortgage loan, the Trust Custodian has possession of the original Promissory Note, all original endorsements and assignments transferring the Note and proof that the ownership of the Note has been transferred for the benefit of the shareholder/investors. Further proof of the ownership of a mortgage loan is required by a public recording of the Mortgage or Assignment of the Mortgage itself. This MUST have occurred by the closing date, in this case in 2005. As it is evident here, no such recording was timely done in this case, according to the public record search in Santa Clara County at the time of filing of this Complaint.

117. Mostly beginning in 2004-2005, hundreds of thousands of residential mortgages were bundled together (often in groups of several thousand of mortgages), and investors were offered the opportunity to buy shares of each bundle, an MBS. Some of the bundles were offered as Bond Certificates, guaranteeing a rate of return. Many of these fake Bond MBS

were funded by large private and governmental pension funds and in some cases, as the case with Greece, by foreign governments, which gave a rise to a global economy crisis.

118. The prospectus was created, the MBS rated "AAA" by the rating companies like Moody's or Standard & Poors in order to invoke a sense of fake confidence for the investors, and the investors' money was pledged and collected long before the homeowner ever even applied for a loan, which would become a part of the pool without proper transfer, like in this case at bar. Thus, investors were doomed from the get-go and investing in nothing. The rating Agencies are currently under investigation by the Justice Department for their role in the financial meltdown.

119. As required by the SEC, each MBS/Trust has a Pooling and Servicing Agreement ("PSA") which must be publicly filed. The only purpose for the PSA is for the administration and distribution of funds to the investors and the obligation of the so-called Trustee in administering the MBS. The investors who put up the money for the MBS and who received the MBS Certificates or Bonds, are not parties to the PSA.

120. The PSA merely sets forth what happens after the mortgages are bundled together. However, the PSA also sets forth a Cutoff Date. The Cutoff Date is the date on which all mortgage loans in the MBS/Trust must be identified and set out in the SEC required list of mortgage loans. Often, these loans were identified and listed for the SEC and the investors, regardless of whether the loan existed or had been closed. Some loans were listed in SEC filings in multiple MBS. In this particular case the 2005 Cutoff Date was missed with regards to the subject Loan. Thus, the Loan itself cannot be part of the pool identified herein.

121. California Commercial Code sections 3301 through 3312 govern enforcement of negotiable instruments. Plaintiff assumes that the Promissory Note at issue here is a negotiable instrument as defined by Cal. Comm. Code section 3104. This view receives
VICENES v. HOMEQ ET AL ADVERSARY COMPLAINT
Case: 10-05376 Doc# 1 Filed: 11/01/10 Entered: 11/01/10 16:00:55 Page 29 of 45  Page 14 of 19

support from Saks v. Charity Mission Baptist Church, 90 Cal. App. 4th 1116, 1132 (2001) ("[A] promissory note is a form of negotiable instrument."), Am. Sec. Bank v. Clarno, 151 Cal. App. 3d 874, 881 (1984) (promissory note may be a negotiable instrument); see also In re Kang Jin Hwang, 396 B.R. 757, 766-67 (Bankr.C.D.Cal., 2008) Id at 707 (a promissory note must satisfy Cal. Comm. Code § 3104). A promissory note that is payable to a specifically identified person is not transferred merely by possession; instead, transfer requires that it be indorsed. See California Commercial Code 3201.

122. Moreover, the deed of trust must be assigned, acknowledged, and recorded before exercising the private power of sale in California. See Strike v. Transwest Discount Corp, 92 CA3d, 735 (1979).

123. A federal court's jurisdiction is dependent upon the standing of the litigant, which includes both constitutional standing and prudential standing. A promissory note that is payable to a specifically identified person is not transferred merely by possession, instead, transfer requires that it be indorsed. As described hereinabove, the Note was not properly and timely indorsed in this case. Moreover, the DOT was neither recorded nor transferred to any new owners. Besides, MERS didn't have the right to do so, among other things, without a registration in California. WMC and Westwood, the fake lender and the trustee respectively are no longer in business or have any interest in the Note or the DOT. Members of MERS like Wells Fargo not only didn't comply with the recording requirements pursuant to California law, but with the MERS' terms as well cited herein. The whole electronic assignment scheme is an illegal sham to avoid different taxes by the Defendants, conceal the identity of the true real parties in interest that may never existed in this particular case and to defraud the real investors and homeowners like the Plaintiff, as described hereinabove.

124.     California Civil Code sections 2924 through 2924l govern non-judicial foreclosures pursuant to a deed of trust. Non-judicial foreclosure may be initiated by a "trustee, mortgagee, or beneficiary, or any of their authorized agents." Cal. Civ. Code § 2924(a)(1). Even when the deed of trust designates a party as a trustee or beneficiary and the party complies with the remaining requirements of sections 2924 through 2924l, this is not sufficient to demonstrate that a party has the power to foreclose, because the party must also demonstrate that it is a "person entitled to enforce" the deed of trust under California Commercial Code section 3301. In this case, however, Wells Fargo cannot demonstrate that it is a trustee, mortgagee, and beneficiary or authorized agent, as defined by California law (not to confuse with the different kind of Trustee under the pooling agreement) with standing to foreclose or collect any payments under the DOT or the Note. Neither does Ocwen or any of the named herein Defendants.

125.     The Loan documents in the present case require the borrower or Plaintiff to pledge the escrow funds as additional security or "Escrow Items" (See ¶3 of DOT" **Exh. A**) for the principal and interest due under the promissory Note and DOT. Moreover, the Loan documents provide for a security interest also in Balloon Rider secured by the other than principal residence assets. Thus, the Loan is not secured solely by the security interest in the Plaintiff's Property within the meaning of section 1322(b)(2) of the bankruptcy code and hence its anti-modification provision doesn't apply in this case at bar. Consequently, the Loan should be bifurcated as undersecured mortgage into secured and unsecured portions under section 506 of the bankruptcy code as of the time of confirmation of the Debtor's plan. The current market value of the Property is circa $421,000 according to www.zillow.com

**FIRST CAUSE OF ACTION FOR FRAUD
(AGAINST HOMEQ, WELLS FARGO AND OCWEN)**

126. Plaintiffs incorporate herein by reference the allegations made in paragraphs 1 through 125, inclusive, as though fully set forth herein.

127. HomEq, its successor-in-interest Ocwen and purported holder of the Note Wells Fargo (collectively referred to as "Foreclosing Defendants") made the above-referenced false representations, concealments and non-disclosures with knowledge of the misrepresentations, intending to induce Plaintiff's reliance, which the unsuspecting Plaintiff justifiably relied upon, resulting in damage to his credit standing, costs and time spent in defending frivolous actions to save his Property. Plaintiff was unaware of the true facts. Had Plaintiff known the true facts, Plaintiff, among other things, would not have maintained the Foreclosing Defendants as his alleged lender, servicer and the alleged trustee (and his alleged agents) and/or would have taken legal action immediately to save his Property. Thus, any applicable statutes of limitation may have been equitably tolled in this case.

128. Plaintiff is informed and believes, and based thereon alleges, that these representations were false when made and were known to be false by the Foreclosing Defendants when made. Particularly, the Foreclosing Defendants, filed the proof of claims in the Bankruptcy Case, without joining in a proper party in interest, which may doesn't exist in this case. Moreover, the Foreclosing Defendants sought to foreclose on the Property in May –July 2007 by fraudulently misrepresenting the Plaintiff's payment account status to the Court, fraudulently obtaining the Protection Order and filing the Amended Proof of claim with unjustified additional $800 as attorney's fees, while also lacking standing as real party in interest. The Foreclosing Defendants are not entitled to the attorney's fees, nor do they have standing to file any proof of claim or collect debt, as described hereinabove.

129. In July of 2010, the Foreclosing Defendants brought a barrage of frivolous foreclosure actions in violation of the new foreclosure laws, while the Debtor was trying to

modify the Loan under HAMP program. These actions are the continuation of the fraudulent conduct, which started in May of 2007. For the first time, Wells Fargo was introduced as an alleged holder of the Note on July 20, 2007 in the false declaration of Ms. O'Brien-Moore.

130. When a promissory note secured by a MERS deed of trust/mortgage was assigned to a mortgage backed security entity ("MBS"), a securitized mortgage investor pool, mortgage loan pool, special purpose vehicle ("SPV"), or other real estate mortgage investment conduit ("REMIC"), pursuant to MERS' own rules and membership agreements the agency authority, if any, and the relationship of MERS and all of its members to the promissory note and deed of trust/mortgage was extinguished, and a truthful recording should have been made to accurately reflect the change of status with respect to the loans. None of these required steps were done in this case.

131. The MERS membership agreement obliged the Foreclosing Defendants to make two separate recordings in the event of a transfer to a mortgage backed security pool or trust (MBS, SPV, or REMIC) outside the MERS system: (1) an assignment of beneficial interest and (2) a designation of substitute trustee or beneficiary.

132. Immediately upon every such assignment to a securitized mortgage pool trust, the assignment of the Note and/or DOT to a new beneficiary was required to be recorded in the Santa Clara County where the real estate was located. Member of MERS Wells Fargo, however, failed to make such recordings or pay the required fees.

133. By taking such actions as preparing and recording documents containing information the Foreclosing Defendants knew was false including without limitation documents which incorrectly and untruthfully designate MERS, which at all material times before July 2010 was not a registered in California entity, as a beneficiary or nominee of the fake lender (Defendant WMC, which is no longer has any interest in the Loan), including but not limited to:

(1) deeds of trust; (2) notices of substitute trustee; (3) notices of default; (4) trustees' deeds of sale following foreclosure; (5) recording documents which purported to assign from MERS to some other entities without first transferring the underlying promissory Note evidencing such indebtedness; and (6) preparing and recording other documents intended to avoid or decrease recording fees regarding documents that would otherwise have reflected the truth.

134. The Foreclosing Defendants knew, and should have known, the MERS system was a sham; was intended to wrongfully bypass the counties' recording requirements; divested the borrowers of the right to know who owned the promissory Note that was executed with the DOT/mortgage or other security instrument; and recorded false documents to initiate and pursue non-judicial foreclosures, and to otherwise decrease or avoid payment of fees to the Counties and the Cities where the real estate is located, in this case in Santa Clara County. Thus, any wrongful conveyance of title related to the Property would constitute a fraudulent conveyance and is void.

135. The Foreclosing Defendants' actions complained of hereinabove were taken with reckless disregard, and or willful ignorance that the recording of false documents and the failure to record truthful documents jeopardized the real property recording system adopted by the Legislature for the purpose of maintaining certainty in real estate transactions and for public knowledge. In this case, many pleadings and declarations of McCarthy & Holthus counsel, like Ms. Philips filed with the Court in the Bankruptcy Case mentioned herein were based on the false misrepresentations by the alleged servicer's employees like Vice President Tracey O'Brien-Moore or Mr. Walter, misrepresenting to the Court the true facts, like who owns the Note or the true status of Plaintiff's payments.

136. The Foreclosing Defendants are committing an ongoing fraud, which constitutes oft-repeated illegal conduct like in case of <u>In re Lee</u>, 408 B.R. 893 (Bankr.C.D.Cal.,